UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RALPH E. SMITH, JR.,

     Plaintiff,       Case Number 10-12539
                 Honorable David M. Lawson

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS, RICHARD JENKINS, MIKE
SULSKI, DOUGLAS KELLEY, ELVIS ROGERS,
JON CLARK, GARY RUDOLPH, WILL RILEY,
SHERRY BURT, JOE LAIER, LEO GAJEWSKI,
and JIMMY WATERS,

     Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

    Plaintiff Ralph Smith, Jr. was fired from his job as a prison guard. He was reinstated later, but he lost his back pay, seniority, and benefits. He has filed the present action against the Michigan Department of Corrections (MDOC) and some of its employees alleging that they denied him certain pre-termination procedures in violation of the Fifth and Fourteenth Amendments, their actions constitute retaliation in violation of the First Amendment and Title VII of the Civil Rights Act of 1964, and their conduct violates state law. The defendants filed a motion to dismiss, arguing that the procedural due process claim fails as a matter of law and the other claims are barred by both sovereign and governmental immunity. The Court heard oral argument on February 18, 2011, at which time the plaintiff conceded that some of his claims must be dismissed. The Court now finds that the complaint states a claim for deprivation of rights under the Fourteenth Amendment, but the claims against the MDOC and some of the state law claims must be dismissed. Therefore, the Court will grant in part and deny in part the defendants' motion to dismiss.

I.

Although the incidents in this case are tinged with racial overtones, the plaintiff has not alleged race discrimination. Instead, he alleges in his complaint that the MDOC, Warden Sherry Burt, and corrections officials Will Riley, Gary Rudolph, and Jon Clark, deprived him of his procedural rights before terminating him in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments; Burt and the MDOC discriminated against him on the basis of his gender in violation of the Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2102; Clark, Burt, Riley, Rudolph, and corrections employees Richard Jenkins, Mike Sulski, Douglas Kelley, Elvis Rogers, Joe Laier, and Leo Gajewski tortiously interfered with his business expectancy; the MDOC, Jenkins, Sulski, Rogers, Clark, Laier, Kelley, and Gajewski conspired to file false reports of the incident that precipitated the termination; the MDOC, Riley, Rudolph, and Burt retaliated against him when he filed his administrative complaint; and Rudolph, Riley, and Burt were negligent in failing to train him on new systems when his employment was reinstated.

According to the complaint, here is what happened. Ralph Smith began his employment with the MDOC on March 5, 1989 at the Southern Michigan Correctional Facility at Jackson, Michigan. He asserts that his employment record demonstrates his satisfactory or above-expectations performance throughout the first twenty years of his employment.

In November 2007, the MDOC closed down JMF. Smith and several other officers were reassigned to the Parnall Correctional Facility, also in Jackson. Smith held the job of Resident Unit Manager. In early December, Smith suffered a ruptured Achilles tendon for which he was scheduled to receive surgery on December 30, 2008. In the interim, he was stationed in the key bunker, where keys for different units of the prison are stored on numbered hooks. When a corrections officer

-2-

removes a key for use in the prison, the key is tracked with the officer's key tag, which is placed on the empty hook. On December 27, 2008, Corrections Officer Richard Jenkins approached Smith in the bunker to return a set of keys, identifying the key hook on which his tag had been placed. Smith mistakenly removed the key tag from the incorrect hook. Jenkins reacted to this innocent mistake by yelling "No! God damn it! I need the tag off of key #28 not #56. What are you? A fucking stupid idiot or something! You didn't check the fucking keys!" Compl. at ¶ 30. Jenkins threw the keys he was returning through the return slot in a way that hit Smith's hand. As he walked away, Smith overheard Jenkins call him a "stupid nigger." *Id.* ¶ 32. Smith did not respond to these comments, but remarked to Corrections Officer Douglas Kelley, who witnessed the event and questioned Jenkins's conduct, that he would ask Jenkins about the interaction later.

The following day, Smith approached Jenkins after roll call at approximately 1:18 p.m. Smith asked about the previous day's incident and apparently expressed his displeasure with Jenkins' behavior. Jenkins responded that "the best thing for you to do is return back to the bubble, sit down and pass out some more fucking keys!" *Id.* ¶ 35. Jenkins knocked into Smith, who fell off-balance and impacted his injured foot into the ground, which caused a fracture of one of the bones in his foot and further damage to some cartilage. Jenkins followed Smith into the building where he was stationed, shouting "go back to your fucking assignment" and "I know how to fix you!" *Id.* ¶ 37. The plaintiff asserts that he intended to report the incident as soon as possible, but was unable to do so before Jenkins filed a countervailing report against him.

At 3:35 p.m. that same day, Lieutenant Jon Clark approached Smith in the key bunker, instructed him to collect his belongings, and brought him to Deputy Warden Will Riley's office. Riley informed Smith that the MDOC was beginning an investigation into the incident between him

and Jenkins, he was being placed on a Stop Order, and he would not be permitted to return to work until the investigation was complete.  Smith says that Riley did not give him additional information about the charges against him, but did state his belief that Smith was the aggressor and had shoved Jenkins.  The plaintiff explained that his injury prevented him from being the aggressor, but Riley did not want to hear his explanation.  He asked to make a statement or file a complaint against Jenkins, but Riley denied his request.  Before surrendering his state identification card and being escorted from the premises, Smith was given the opportunity to speak briefly with his union representative.

On December 30, 2008, Smith filed a complaint against Clark with the MDOC's internal equal employment opportunity (EEO) department, alleging that Clark denied him the opportunity to make a statement, file a complaint, or present his account of the incident before Clark took disciplinary action against him.  The plaintiff believes that the complaint fulfilled the requirement that he seek recourse through the administrative process prior to filing a case with this court.  The plaintiff also underwent surgery on his Achilles tendon on the same day.

On January 9, 2009, Smith received a letter from the MDOC confirming his suspension as of December 28, 2008 and explaining that the suspension would be converted to Administrative Leave after 7 days.  The MDOC never converted his employment status or refused to honor his Administrative Leave; instead, Smith was forced to exhaust his allowable leave time and lose his accumulated seniority.

On January 12, 2009, Smith filed another complaint with the MDOC's EEO department, this time against Jenkins.  The MDOC's written policies set forth a detailed procedure for processing such complaints.  For instance, department procedure requires the EEO administrator to review the

-4-

complaint and conduct further investigation within 45 days.  The complainant and accused employee have a right to make a statement.  The assigned investigator is required to compile an investigation packet that includes the information and statements gathered during his investigation.  Then the EEO administrator and a management representative decide whether to file charges.  At that point, the complainant must be notified in writing of the status of his complaint.  Smith alleges that the MDOC failed to follow these policy guidelines by failing to commence timely investigations of his complaints and failing to provide him with written notice of MDOC actions on his complaint or on the allegations against him.

Captain Gary Rudolph was assigned to serve as the investigator of the case against Smith. On January 26, 2009, Smith met with Rudolph to complete his statement for the packet.  Rudolph asked Smith questions and recorded his responses.  Rudolph provided Smith with a typed copy of the responses following the interview, although he did not allow him to review the notes prior to typing.  He told Smith to call him after 9:00 that night to make any changes.  Smith called Rudolph at 9:30 p.m. with edits but was unable to reach him, and Rudolph never called Smith back.  Instead, Rudolph forwarded the unedited responses with the investigation packet to Warden Sherry Burt without Smith's approval or required signature on the document.  Smith received a copy of the packet on February 21, 2009 and learned that a disciplinary conference was scheduled for February 25, 2009.  Smith contacted his union representative on February 23 to discuss the unapproved documents and the conference.

When Smith appeared for the conference on February 25, Warden Burt informed him that the conference had been cancelled.  She said that a representative from the union had instructed MDOC personnel not to hold the conference due to potential violations of Smith's rights.  Smith

-5-

contends that this cancellation violated MDOC policy, which required the agreement of both parties before cancellation. Rudolph was present at the cancelled conference and asked Smith to sign the unedited report detailing his responses. Smith refused and Burt set a deadline of March 4, 2009 for the completed report. Smith made corrections to the report and signed off on the corrected report on that date. However, when he received an updated disciplinary packet for the rescheduled hearing, Smith found that his statement had not been updated to reflect his changes. He also discovered that his signatures did not match on different pages in the packet and that several of the changes he had approved had not been made.

The rescheduled disciplinary conference took place on March 18, 2009. Smith attended and gave testimony. He was notified of the results of his hearing on April 3, 2009 via regular mail, but he contends that violated MDOC policy, which requires notification within ten business days by certified mail. On April 10, 2009, Smith received a second letter from the MDOC terminating his employment effective April 7, 2009. Smith alleges that several of the officers who witnessed the events gave false statements that the plaintiff was at fault for instigating the incident, and in doing so violated several MDOC policies. He also alleges that the defendants violated his due process rights by failing to act as neutral investigators, in some cases refusing to investigate at all, producing incorrect reports, relying on inaccurate reports to terminate him, and failing to punish Caucasian employees for similar incidents. He points to one incident during the summer of 2008, when Caucasian officers on the day shift left urine in the soap dispenser in the staff restroom on the A and B Prisoner Housing Unit. Smith says that the officers responsible were not disciplined; instead, the soap dispensers were removed.

-6-

Smith appealed his termination through the grievance process and ultimately was reinstated in September 2009. However, the MDOC failed to repay his lost wages or reinstate the seniority, leave time, and other benefits he had lost during his suspension and termination. The MDOC began investigating Smith's complaint against Jenkins following his reinstatement pursuant to a directive from the MDOC's EEO department.

Although Smith was reinstated in September 2009, he was unable to work due to the injuries he sustained on December 28, 2008. He had surgery for these injuries in October 2009 and ultimately returned to work on January 4, 2010. He was not allowed to return to his former position as a Resident Unit Officer for one month and remained assigned to the key bunker in the interim. While he was off the job, the prison implemented a new computerized prisoner counting system that Resident Unit Officers were required to use. Smith alleges that he received no training on this system, nor was he provided with a password to use the system. When Smith returned to his position as a Resident Unit Officer in early February, he still did not receive training or a computer password. But when a count error occurred on February 17, 2010 under the plaintiff's and a co-worker's watch, both employees were punished; Smith received a three-day suspension.

Smith remains employed by the MDOC, but he is unsatisfied with how he was treated. He filed his complaint in this Court on June 27, 2010. The defendants responded with their motion to dismiss.

## II.

In their motion to dismiss, the defendants advance two main arguments. First, they say that the plaintiff has not stated a viable claim under the Fifth or Fourteenth Amendments because the Fifth Amendment does not apply to the States, the Fourteenth Amendment cannot be pled as a stand-

alone violation, and the pleaded allegations do not support the plaintiff's argument that he received inadequate process prior to his termination. Second, the defendants contend that the Court has no subject matter jurisdiction over the claims because of various immunity doctrines. In his written response and at oral argument, the plaintiff agreed that the Eleventh Amendment bars his claims against the MDOC; only the Fourteenth Amendment, not the Fifth, applies to the state actors; there are no factual allegations pleaded against defendant Waters; and he cannot support his gender discrimination claim under the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2102. Therefore, the Court will dismiss the case against the MDOC and Jimmy Waters, the claims in count 1 of the complaint based on the Fifth Amendment, and count 2 of the complaint alleging gender discrimination under state law.

The defendant contends the Fourteenth Amendment procedural due process claim must be dismissed under Federal Rule of Civil Procedure 12(b)(6). That rule permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). When deciding a motion under that rule, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996). "[A] judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Columbia Nat'l Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Ibid.* "To survive a

-8-

motion to dismiss, [a plaintiff] must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1949 (2009)." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010).

Under the new regime ushered in by *Twombly* and *Iqbal*, pleaded facts must be accepted by the reviewing court but conclusions need not be unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal*, 129 S. Ct. at 1951 (quoting *Twombly*, 550 U.S. at 555). However, as long as a court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabian*, 628 F.3d at 281 (quoting *Iqbal*, 129 S. Ct. at 1949).

## A.

The Fourteenth Amendment does not contain specific language creating a private right of action, but it is well-settled that the rights created thereunder can be enforced through 42 U.S.C. § 1983. *See Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 611 (2008) (reiterating that "§ 1983 provides a cause of action for all citizens injured by an abridgment of [the] protections" found in the "Due Process Clauses of the Fourteenth Amendment, and other provisions of the Federal Constitution"). Although the complaint does not reference section 1983, that omission is not fatal to the plaintiff's case at the pleading stage. *See Majeske v. Bay City Bd. of Educ.*, 177 F. Supp. 2d 666, 670-71 (E.D. Mich. 2001) (holding that the failure to cite section 1983 in the complaint did not

prevent the court from determining that it pleaded a violation of that statute where "the complaint claimed a violation of federal rights, which necessarily must be presented under 42 U.S.C. § 1983); *see also Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) (reaffirming that only notice pleading is required in actions under 42 U.S.C. § 1983).

"To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege a violation of a right secured by the federal Constitution or laws and must show that the violation was committed by a person acting under color of state law." *Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir. 2010) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). There is no dispute in this case that the defendants are state actors. The defendants insist, however, that the plaintiff cannot show a deprivation of his procedural rights because, according to the allegations of the complaint itself, the plaintiff was afforded sufficient process before he was fired when he was interviewed for the investigation packet, allowed to make corrections to the packet, attended a disciplinary conference with his union representative at which he gave testimony, and successfully appealed the termination decision. The plaintiff counters by pointing out that the defendants did not adhere to the established departmental procedures for imposing employee discipline, denied him the opportunity to present his version before he was suspended and ultimately fired, and allowed misinformation that poisoned the proceedings through the formal hearing stage.

A procedural due process violation is pleaded adequately if the plaintiff plausibly alleges that (1) he has a life, liberty, or property interest protected by the Constitution; (2) he was deprived of that interest by a state actor; and (3) he was not afforded timely and adequate process under law. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009). The defendants concede that the plaintiff

-10-

has stated the first two elements.  The defect in the complaint, they contend, lies in the failure to allege that the defendants deprived the plaintiff of adequate process before terminating him.

"The right to procedural due process requires that when a State seeks to terminate a protected interest . . . it must afford notice and opportunity for hearing appropriate to the nature of the case." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 296 (6th Cir. 2006) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972) (internal quotation marks and alterations omitted)).  "In the context of employment rights, the Supreme Court has explained that 'the root requirement of the Due Process clause' is 'that an individual be given the opportunity for a hearing before he is deprived of any significant property interest.'  Acknowledging 'the severity of depriving a person of the means of livelihood[,]' the Court has noted that '[w]hile a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job.'"  *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542-43 (1985)).

Public employees with a property interest in their jobs generally must have a hearing before termination and afterward.  *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 766-67 (6th Cir. 2010) ("'For a public employee with a property interest in continued employment, due process includes a pre-termination opportunity to respond, coupled with post-termination administrative procedures.'" (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 315 (6th Cir. 2006)).  Perfunctory pre-termination procedures usually demand a more exacting post-termination hearing.  *Carter v. Western Reserve Psychiatric Habilitation Ctr.*, 767 F.2d 270, 273 (6th Cir. 1985) (per curiam).

-11-

The Sixth Circuit has observed that "[p]re-termination hearings 'need not be elaborate.'" *Mitchell*, 375 F.3d at 480 (quoting *Loudermill*, 470 U.S. at 545). Nonetheless, "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546; *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (noting that the fundamental requirement of procedural due process is that an individual be given an opportunity to be heard at a meaningful time and in a meaningful manner). Pre-termination hearings have been described as an "initial check against mistaken decisions." *Loudermill*, 470 U.S. at 545. "Post-termination hearings, on the other hand, 'serve to ferret out bias, pretext, deception and corruption by the employer in discharging the employee.'" *Mitchell*, 375 F.3d at 480 (quoting *Duchesne v. Williams*, 849 F.2d 1004, 1008 (6th Cir. 1988)).

The defendant argues that the plaintiff's Fourteenth Amendment claim must fail because the complaint clearly indicates that the plaintiff had an opportunity to present a report detailing his side of the incident, received notice of both hearing dates, attended both hearings and was represented by his union representative at the second hearing, and had an opportunity to provide testimony. However, the plaintiff also alleges that he was denied a true or meaningful opportunity to be heard because the defendants did not provide him with a neutral interviewer, altered his statements, submitted inaccurate statements to the disciplinary board that were attributed to him, and failed to provide him sufficient notice of his hearing dates or their cancellations. The plaintiff acknowledges that he had an opportunity to provide testimony at the hearing. However, he contends that the inaccurate statements in the packet attributed to him predisposed the disciplinary board to discredit his testimony at the hearing.

-12-

The complaint alleges, therefore, that the opportunity to be heard was a mere formalism, and his constitutional right in effect was taken away from him. The Court concludes that the complaint alleges that the plaintiff was denied his procedural rights. In addition, the plaintiff has alleged that the post-deprivation process was not sufficient because, although he was reinstated, the plaintiff was never compensated for lost wages, leave time, or seniority and remains injured. The Court finds that count 1 of the complaint states a claim.

### B.

In Count 5 of the complaint, the plaintiff alleges that defendants Rudolph, Riley, and Burt retaliated against him for filing an internal EEO complaint. The acts of retaliation alleged in the complaint are that Rudolph "entered a false report," Compl. ¶¶ 134-35, and these three defendants "did not process or follow up on the Plaintiff's EEO complaints for over 9 months," Compl. ¶¶ 136-37. The complaint itself indicates that the alleged retaliation is unlawful because the firing violates public policy. The defendants argue in their motion that the claim amounts to an intentional tort under state law subject to governmental immunity. The plaintiff responded that the claim was meant to allege violations of the First Amendment and Title VII. At oral argument, the defendants contended that even under those theories, the claim is not viable.

The governing law in the Sixth Circuit that applies to claims of retaliation for exercising First Amendment rights was set forth by the Sixth Circuit in *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc):

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two — that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

-13-

Filing a complaint with the MDOC's EEO office can be viewed as an act of seeking redress from the government, and as such can be considered protected conduct to satisfy the first element of the claim. *See Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578-79, 781-81 (6th Cir. 2000); *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591-92 (6th Cir. 2007). It is unclear how delaying adjudication of a complaint can amount to adverse action for filing that complaint. Delaying adjudication in effect is non-action, so the delay itself will not satisfy the second element. However, the Sixth Circuit has held that making false statements with the intent to interfere with a person's employment can constitute adverse action in a First Amendment retaliation case. *See Paige v. Coyner*, 614 F.3d 273, 281 (6th Cir. 2010) (observing that "[l]osing one's job and accompanying benefits is certainly severe enough to deter a person of ordinary firmness from speaking at public meetings"). The plaintiff also has alleged that the false statements were provoked by his filing, which is plausible since there would be no other reason to file statements except to address the internal proceedings involving the incident. The Court finds that the complaint states a claim for retaliation in violation of the First Amendment. Under the First Amendment, governmental immunity is not an available defense. *See Pucci*, 628 F.3d at 768-69.

The Title VII claim is problematic. Certainly, Title VII prohibits an employer from retaliating against an employee for making a charge. *See* 42 U.S.C. § 2000e-3(a). But Title VII contains procedural requirements that must be followed before a lawsuit can be brought. "Plaintiffs must typically file a timely discrimination charge with the EEOC in order to bring a Title VII lawsuit." *Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001) (citing *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 407 (6th Cir. 1999)); *see also* 42 U.S.C. § 2000e-5.

-14-

The plaintiff admits that he never availed himself of the administrative procedures under Title VII by filing a charge with the Equal Employment Opportunity Commission (EEOC). He resorted only to the internal EEO procedure prescribed by the MDOC. When an aggrieved employee fails to mention retaliation in an EEOC filing, courts will excuse that omission when the retaliation occurred after the charge was made to the EEOC. *See Strouss v. Michigan Dept. of Corrections*, 250 F.3d 336, 342 (6th Cir. 2001). However, when the retaliation is known to the employee when the EEOC filing is made (or should have been made), the employee must exhaust that remedy before filing suit. *Ibid.*; *see also Spengler v. Worthington Cyclinders*, 615 F.3d 481, 489 n.3 (6th Cir. 2010). Because the plaintiff made no EEOC filing, he may not pursue a Title VII retaliation claim in this Court.

C.

The defendants also argue that the plaintiff's state law claims are barred by governmental immunity. Those claims include tortious interference, conspiracy, and negligence. Michigan's Governmental Tort Liability Act states generally that employees of state agencies are immune from tort liability while in the course of employment and when "engaged in the exercise or discharge of a governmental function" under certain conditions. Mich. Comp. Laws § 691.1407(2). "A '[g]overnmental function' is an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." *State Farm Fire & Cas. Co. v. Corby Energy Servs., Inc.*, 271 Mich. App. 480, 483, 722 N.W.2d 906, 909 (2006) (citing Mich. Comp. Laws § 691.1401(f); *see also Tryc v. Mich. Veterans' Facility*, 451 Mich. 129, 134, 545 N.W.2d 642 (1996). The governmental immunity statute includes a savings provision that states that the legislation "does not alter the law of intentional torts as it existed before July 7, 1986." Mich. Comp. Laws § 691.1407(3). That reference was meant to preserve the rules of governmental

-15-

immunity for intentional torts set out in *Ross v. Consumers Power Co. (On Rehearing)*, 420 Mich. 567, 363 N.W.2d 641 (1984). *See Odom v. Wayne Cnty.*, 482 Mich. 459, 461-62, 468, 760 N.W.2d 217, 218, 221 (2008).

Parsing *Ross*, the Michigan Supreme Court outlined three elements state employees must establish to avail themselves of the governmental immunity defense:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
> (c) the acts were discretionary, as opposed to ministerial.

*Id.* at 479-80, 760 N.W.2d at 228; *see also id.* at 470-71, 760 N.W.2d at 222-23 (discussing the statutory requirements of the governmental immunity act).

As noted earlier, the complaint alleges the following tort counts against the following defendants: tortious interference with business expectancies through a concert of action by Jenkins, Sulski, Kelley, Rogers, Clark, Burt, Riley, Rudolph, Laier, and Gajewski; conspiracy to provide false reports by the MDOC, Jenkins, Sulski, Rogers, Clark, Laier, Kelley, and Gajewski; and negligence for failure to train by Rudolph, Riley, and Burt.

The parties do not dispute that tortious interference is an intentional tort and is governed by the *Ross* framework. The plaintiff concedes that the defendants have met the first element of this defense but argues that their actions were not taken in good faith and were ministerial in nature. The Michigan Supreme Court described "[i]n a nutshell" the difference between discretionary acts and ministerial acts: "the former involves significant decision-making, while the latter involves the execution of a decision and might entail some minor decision-making." *Ross*, 420 Mich. at 634-35, 363 N.W.2d at 668.

-16-

The defendants state in a conclusory fashion that they performed their job functions in good faith and suggest that the plaintiff merely dislikes the result of their actions and has failed to demonstrate bad faith.  But the burden on this element falls to the defendants.  *Odom*, 482 Mich. at 479, 760 N.W.2d at 227-28 (holding that "the burden continues to fall on the governmental employee to raise and prove his entitlement to immunity as an affirmative defense").  The plaintiff has alleged in the complaint that the defendants collaborated to make the same false statements against the plaintiff and attempted to conceal the plaintiff's side of the story.  The defendants have not met their burden of demonstrating good faith at the pleading stage of the case.  In addition, although the decision to engage in an investigation is discretionary, the act of carrying out the investigation is ministerial.  *See Ross*, 420 Mich. at 635, 363 N.W.2d at 668.  Based on the allegations in the complaint, it appears that at least some of the investigators or witnesses, that is, defendants Jenkins, Sulski, Kelley, Rogers, Rudolph, Laier, and Gajewski, were carrying out decisions made by others, and therefore would not be entitled to governmental immunity.  That may not be the case for defendants Clark, Riley, Burt, and Rudolph.  Nonetheless, at the pleading stage, the governmental immunity defense is not developed sufficiently to permit summary dismissal of the tortious interference count.

The parties likewise do not dispute that conspiracy is an intentional tort and is governed by the *Ross* framework.  The plaintiff again concedes that the defendants have met the first element of this defense, but argues that the defendants' actions were not taken in good faith and were ministerial in nature.  The plaintiff has directed this count against Jenkins, Sulski, Rogers, Clark, Laier, Kelley, and Gajewski, and relies on the same factual basis as the tortious interference count at least as to defendant Clark.  The same result obtains: there are sufficient allegations in the

-17-

complaint to require the defendants to establish evidence of their good faith, so dismissal at this stage based on the governmental immunity defense is not warranted.

A different standard applies to the negligence count, in which the plaintiff alleges fault against defendants Rudolph, Riley, and Burt for failure to train the plaintiff on new systems when he returned to work. State employees are immune from most negligent torts unless their conduct rises to the level of gross negligence. Mich. Comp. Laws § 691.1407(2)(c). "Gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* at § 691.1407(7)(a). The plaintiff has cited no case law supporting the idea that the failure to train an employee on a computer program amounts to gross negligence. He has pointed out that MDOC policy requires administrators and supervisors to notify staff members of new policy directives, provide hard copies, and obtain staff signatures verifying that the staff member has had the opportunity to read the policy. Compl. ¶ 82 & Ex. C, Policy Directive 01.04.110, at ¶¶ S-U. The policy cited by the plaintiff does not mention training, although providing training no doubt would be prudent. The plaintiff argues that the failure to train equals gross negligence because it was highly likely that he would be disciplined following a counting error, the defendants acted were aware of those consequences, and they acted without regard to the employment harm the plaintiff would suffer. The Court disagrees. The failure to provide training for a new computer system under the circumstances alleged by the plaintiff does not imply "reckless disregard of the consequences as affecting the life or property of another." *McKeever v. Golfsbury Speedway, Inc.*, 57 Mich. App. 59, 62, 225 N.W.2d 184, 186 (1974) (quoting *Denman v. Johnston*, 85 Mich. 387, 396, 48 N.W. 565, 567 (1891)). Certainly an untrained employee may make a mistake, but that would not lead

-18-

inevitably to discipline or loss of privileges or property.  The Court fails to see how this allegation rises beyond ordinary negligence.  Therefore, governmental immunity bars this state law claim.

III.

The Court finds that the Eleventh Amendment bars the claims in the complaint against the MDOC, the plaintiff has not pleaded any factual allegations against defendant Waters, the plaintiff cannot support his gender discrimination claim under the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2102, he has not stated a claim against state officials under the Fifth Amendment, he has not alleged a viable retaliation claim under Title VII of the Civil Rights Act of 1964, and his negligence claim is barred by state governmental immunity.

Accordingly, it is **ORDERED** that the defendants' motion to dismiss [dkt. # 17] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the complaint is **DISMISSED** against defendants Michigan Department of Corrections and Jimmy Waters **ONLY**.

It is further **ORDERED** that the Fifth Amendment claim in Count 1, all claims in Counts 2 and 6, and the retaliation claim based on Title VII of the Civil Rights Act of 1964 in Count 5 of the complaint are **DISMISSED**.

s/David M. Lawson          
DAVID M. LAWSON
United States District Judge

Dated:   February 23, 2011

-19-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 23, 2011.

s/Deborah R. Tofil
DEBORAH R. TOFIL